LAW OFFICE OF MICHAEL L. FRADIN
Michael L. Fradin, Esq.
8401 Crawford Ave. Ste. 104
Skokie, IL 60076
Telephone: 847-986-5889
Facsimile: 847-673-1228
Email: mike@fradinlaw.com


Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TESS HERMAN, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| | <u>DEMAND FOR JURY TRIAL</u> |
| *v.* | |
| OHIO UNIVERSITY and YUSUF KALYANGO | |
| Defendants. | |

**<u>COMPLAINT</u>**

Now Comes Plaintiff, Tess Herman ("Plaintiff Herman") by and through her Attorney, Michael L. Fradin, Attorney at Law, and brings this action against Ohio University for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Plaintiff also bring this action under 42 U.S.C. § 1983 ("1983") against Yusuf Kalyango ("Defendant Kalyango") for violations of Plaintiff's right to equal protection, as applicable to Plaintiff, based on the grounds of sex, while acting in his individual capacity under color of law.

The severe, pervasive and objectively offensive discrimination, sexual harassment, and physical sexual violations to which the Plaintiff was subjected, coupled with the Defendants' deliberate indifference and clearly unreasonable response to sexual misconduct, caused Plaintiff to lose educational

benefits and opportunities and to suffer other damages. Defendants' actions and deliberate indifference have caused lifelong injuries and damages that Plaintiff suffered and continues to suffer. Defendant Ohio University was deliberately indifferent to Defendant Kalyango's past misconduct, fostering a safe space for sexual misconduct and empowering Defendant Kalyango to confidently abuse his authority. If this Court does not grant appropriate relief, Defendants will not stop causing severe and permanent harm to its female graduate students. Plaintiff brings this complaint in her true name and alleges as follows:

## PARTIES

1.      Plaintiff Herman is a female and a resident of the state of Ohio. At all times material hereto, Plaintiff Herman was a graduate student at Ohio University and was enrolled in two graduate programs at Ohio University, pursuing both a Master of Science of Journalism as well as a Master of Science of Environmental Studies.

2.      Ohio University is a public educational institution located in Athens, Ohio.

3.      Ohio University receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

4.      Defendant Kalyango is a male and resident of Athens, Ohio. At all times material hereto, Defendant Kalyango was a professor at Ohio University. At the time of the filing of this Complaint, Defendant Kalyango remains a professor at Ohio University.

5.      At all relevant times, Defendant Kalyango was an employee of a publicly-funded educational institution and was acting individually, exploiting his governmental authority and power, violating and depriving Plaintiff of her constitutional rights.

6.      Defendant Kalyango was, at all material times, an employee of a publicly-funded educational institution.

7.      Defendant Kalyango's abuse of his power and his government-granted authority violated Plaintiff's constitutional rights.

## JURISDICTION AND VENUE

8.      This case arises under the laws of the United States, specifically United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et. seq. and 42 U.S.C. § 1983. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

9.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## GENERAL ALLEGATIONS

COMPLAINT AND DEMAND FOR JURY TRIAL

*Defendant Kalyango's unwanted personal and romantic advances towards Plaintiff Herman prior to the Africa Trip*

10.     Plaintiff Herman and Defendant Kalyango first met on or around February 5, 2017 at a Super Bowl party for international students hosted by Defendant Kalyango at his home.

11.     On February 6, 2017, after Defendant Kalyango's Super Bowl party, Defendant Kalyango sent Plaintiff an email that stated: "Let me know when you'll [sic] not busy this week or next week and we will go celebrate post-Super Bowl (win) with a coffee treat or dinner in town." This email makes no mention of this potential coffee treat or dinner involving anyone other than Respondent and Complainant." In the email, Defendant Kalyango also indicated that he had Plaintiff Herman's phone number, which presumably he obtained through Ohio University's Catmail system.

12.     After learning about the educational and employment opportunities that were available through the Institute for International Journalism, including the YALI and SUSI programs, Defendant Kalyango invited Plaintiff Herman out to coffee to discuss details of the programs and possible employment. This meeting lasted for about an hour.

13.     Throughout the course of a few weeks after the super-bowl, Defendant Kalyango repeatedly invited Plaintiff Herman to movies, shopping, and dinner.

14.     Defendant Kalyango, who is African American, invited Plaintiff Herman, who is Caucasian to the movie, "A United Kingdom," a love story about the romance between a white British woman and an African man.

15.     Defendant Kalyango took Plaintiff Herman for meals at the following restaurants: Catalyst Café, Village Bakery, Opa, Salaam, and Star of India, all of which were attended only by Plaintiff Herman and Defendant Kalyango.

16.     During this period, Defendant Kalyango often sent text messages to Plaintiff Herman late at night asking to take her out and telling her that she looked beautiful.

17.     Eventually Plaintiff Herman sent a text back to Defendant Kalyango indicating that he should not text her between 9 pm and 9 am unless it was work related.

18.     Defendant Kalyango offered Plaintiff a position without her having to go through the normal steps and processes.

19.     In mid-March 2017, Plaintiff Herman received an email stating that she had been officially hired to work under Defendant Kalyango's supervision and would be performing regular work by late March, 2017.

20.     Throughout February, March, and April of 2017, Defendant Kalyango continuously and consistently sent Plaintiff Herman text messages and other communications that were clearly personal,

and often romantic, in nature, and were entirely unrelated to work. These communications were often late at night (after 10 PM) and included constant compliments and comments about Plaintiff Herman's physical appearance (on at least one occasion Defendant Kalyango called Plaintiff Herman "beautiful"). Other types of personal messages included frequent invitations to late-night dinners, ostensibly so Plaintiff could get a "break" from work. Defendant Kalyango also often sent Plaintiff Herman text messages that appeared to have been meant for his ex-wife.

21.     On May 3, 2017, Defendant Kalyango sent Plaintiff an email that included a winking emoji.

22.     On May 23, 2017, Defendant Kalyango sent Plaintiff an email that ended, "sweet dreams."

23.     These text messages and communications were clearly an attempt by Defendant Kalyango to ramp up his relationship with Plaintiff Herman from that between a professor and a student into a personal and romantic relationship.

24.     In or around early-mid March 2017, Plaintiff Herman attended a dinner alone with Defendant Kalyango.  During this dinner, Defendant Kalyango invited Plaintiff Herman to work with him as a Program Assistant and Administrative Coordinator for the YALI Connect Camps 13 and 14.

25.     Defendant Kalyango was intentionally unclear about the itinerary of the trip to Africa and what it would entail for Plaintiff Herman. Specifically, Defendant Kalyango arranged for Plaintiff Herman to accompany him on a side-trip to Rwanda; yet for nearly two months after Defendant Kalyango added the Rwanda trip to the itinerary, Plaintiff Herman had no idea as to the agenda for the trip. As late as May 26, 2017, just days before Plaintiff Herman would leave for the trip with Defendant Kalyango, Plaintiff Herman was still unclear as to what the purpose of the Rwanda trip was.

26.     On or around March 17-26, 2017 at 5:09 PM Plaintiff Herman sent a message stating, "Flight looks good to me! Extra work in SA woo!" Defendant Kalyango replied to this text message stating, "But its not South Africa. It's actually Rwanda. I want to show you something. I'm thinking of something outside of the work. Work is only in South Africa. It's for you… sort of… yes, something you're interested in."

27.     On April 26, 2017, Defendant Kalyango sent Plaintiff an email that appears to be him offering to drive Plaintiff Herman from Athens, Ohio to Connecticut where her parents lived—a ten hour trip each way—and back from Connecticut to Athens, Ohio. Defendant Kalyango wrote, "driving ten hours at night can be fun" and "I know a driver . . . for real . . . one who doesn't mind driving ten hours back and forth . . .  seriously."

28.     On Sunday, May 28, 2017, Defendant Kalyango told Plaintiff Herman that the resort in Lake Kivu in Rwanda had only one room, that he and Plaintiff Herman would have to stay in the same room together, and that this was the only option.

### *Defendant Kalyango's unwanted personal and romantic advances towards Plaintiff Herman during the Africa Trip*

29.     During the Africa trip, particularly the Rwanda portion of the trip, Defendant Kalyango paid for many of Plaintiff Herman's expenses, including an expensive gorilla trekking trip for him and Plaintiff Herman.

30.     Defendant Kalyango has not paid for such expenses for others on past work trips.

31.     At least one other person has gone on an excursion with Defendant Kalyango after the end of a YALI program. Defendant Kalyango did not pay for this person's expenses.

32.     Throughout the trip, Defendant Kalyango repeatedly bought plane tickets that placed Defendant Kalyango and Plaintiff Herman next to one another, even though he could have purchased any seat. This means he, for example, could have simply asked Plaintiff Herman where she wished to sit. Defendant Kalyango instead chose to keep Plaintiff Herman in as close proximity as possible on their flights.

33.     Once in Rwanda, Defendant Kalyango again attempted to pressure Plaintiff Herman into sharing a hotel room with him.

34.     Defendant Kalyango continued to attempt to convince Plaintiff Herman to stay in the same room with him by arguing that it was the "only option" and that he would try to stay out of Complainant's way. Plaintiff Herman responded that she did not believe staying in the same hotel room with him was appropriate. Defendant Kalyango then tried to argue for sharing a room because, he claimed, it was not officially part of a university or work trip and that, therefore, it would be okay. Defendant Kalyango relentlessly put pressure on Plaintiff Herman to share a room. He also stated that he would have to miss certain activities if Plaintiff Herman did not share a room with him. Defendant Kalyango also attempted to scare Plaintiff Herman into sharing the room, telling her that she did not understand the dangers of Africa, and that she would be vulnerable by herself. Plaintiff did not cave in to the pressure to share a room with Defendant Kalyango. In anger, Defendant Kalyango then told Plaintiff that she would have to be "all alone."

35.     Because Plaintiff Herman refused the inappropriate request to stay in the same hotel room as Defendant Kalyango, Defendant Kalyango made reservations at a different hotel for Plaintiff. Despite inviting Plaintiff Herman on this additional trip to Rwanda, and attempting to have her stay in a

hotel room with him that he had paid for, Defendant Kalyango would not pay for Plaintiff Herman to stay in her own hotel room in Rwanda, so Plaintiff Herman paid for the room herself.

36.     While Plaintiff Herman was at the hotel in Rwanda after not agreeing to share a room with him, Defendant Kalyango sent a text message to Plaintiff Herman stating, "Sad … I'm sad."

37.     On or around June 10, 2017 in Hatfield, Pretoria, South Africa. Defendant Kalyango bought Plaintiff Herman multiple drinks at the Cubana Havana Club.  Defendant Kalyango also bought multiple drinks for Plaintiff Herman later in the night at the Blue Room Club.   Throughout the night, Defendant relentlessly urged Plaintiff to become intoxicated.  At the Blue Room, after Defendant Kalyango had purchased several drinks for Plaintiff Herman, Defendant Kalyango forcefully grabbed Plaintiff Herman's hands and attempted to force her to dance with him.

38.     Soon thereafter, Plaintiff Herman approached Judy Millesen, a professor at Ohio University, supervisor of the Africa trip, and mandatory reporter of sexual harassment.  Plaintiff told Judy Millesen about Defendant Kalyango's inappropriate and forward conduct.  Judy Millesen responded that enduring Defendant Kalyango's misconduct and bad behavior was an unfortunate part of the job, that she herself had learned to go along with Defendant Kalyango's requests, and that Plaintiff Herman should also do whatever Defendant Kalyango says if she wanted to stay on the job.

39.      Judy Millesen did not report Defendant Kalyango's harassment of Plaintiff Herman to the ECRC, despite being a mandatory reporter.

40.     Judy Millesen encouraged Plaintiff to endure the harassment because Millesen was a close friend of Defendant Kalyango's and because Millesen did not want to take any steps that would potentially interfere with her ability for international travel with Defendant Kalyango.

41.      At the time that Plaintiff Herman reported to Judy Millesen about Defendant Kalyango's misconduct, Millesen was an official with the authority to take corrective action pursuant to 20 USC §1682.

42.      Defendant Kalyango's hostile and retaliatory behavior directed at Plaintiff Herman began after she rebuffed Defendant Kalyango's extremely unprofessional advances during the Africa trip, notably the invitation to share a hotel room with him and the other advances he made, such as attempting to force Plaintiff to dance with him at the club in South Africa.

***Defendant Kalyango's hostile and retaliatory treatment of Plaintiff Herman at the end of and after the Africa Trip***

43.     At the end of the Africa trip, after Plaintiff Herman would not sleep in the hotel room with Defendant Kalyango, Defendant Kalyango's treatment towards Plaintiff Herman was aggressively retaliatory.  For example, when Plaintiff Herman would not go clubbing with him, Defendant Kalyango

gave Plaintiff an angry look and acted with hostility towards her. During the approximate eight hour layover in New York City, Defendant Kalyango expressed anger towards Plaintiff Herman for not staying with him at the airport during the wait and accused her of putting her "personal time" ahead of him, even though he had previously granted Plaintiff Herman's request to leave the airport during the layover.

44.     Once Plaintiff Herman and Defendant Kalyango arrived at Columbus airport, when Plaintiff's bag was missing, Defendant Kalyango aggressively yelled at Plaintiff Herman that it was her fault; airline employees had to come to Plaintiff Herman's defense to attempt to calm Defendant Kalyango.

45.     Upon returning from the Africa trip to Athens, Ohio, Defendant Kalyango's attitude toward Plaintiff Herman grew increasingly aggressive and hostile. Defendant Kalyango missed a series of meetings with Plaintiff Herman that Plaintiff Herman needed in order to complete her tasks associated with the program.

46.     Upon returning from the Africa trip, Defendant Kalyango and Plaintiff Herman needed to meet in order to discuss expense reports and other final matters from the trip. Plaintiff and Defendant Kalyango agreed to meet at 6:30 PM on a Tuesday, but Defendant Kalyango canceled on the day of the meeting at 6:00 PM, just thirty minutes before the meeting began.

47.     The next day Defendant Kalyango said he could meet at 8:45 p.m., but then sarcastically remarked, "that is getting towards your free time." This remark was referencing Plaintiff Herman's earlier attempts to set reasonable boundaries on the time and nature of communications between her and Defendant Kalyango. Plaintiff Herman went to Defendant Kalyango's office to meet at 8:45 p.m. with the receipts for the program trip expenses. Defendant Kalyango, without notice, failed to show up for this meeting.

48.     Defendant Ohio University's internal investigation by ECRC concluded that Defendant Kalyango refused to attend at least three scheduled meetings with Plaintiff Herman to discuss the expense reports. The purpose of these meetings was for Defendant Kalyango to discuss important information related to the expense reports.

49.     In an email, Defendant Kalyango blamed Plaintiff Herman for the expense report situation, stating, "Since we never sat together on any flights, that also contributed to the lack of discussion of the work you had accomplished." Plaintiff Herman avoided sitting next to Defendant Kalyango on planes because his inappropriate personal and romantic advances made Plaintiff Herman extremely uncomfortable.

50.     Sensing the hostile and retaliatory animus directed towards her from Defendant Kalyango, Plaintiff Herman went to Defendant Ohio University's Human Resources who advised

Plaintiff Herman to email a response to Defendant Kalyano, which Plaintiff Herman did on the evening of June 5, 2017.

51.    In his reply to the email, Defendant Kalyango continued his passive aggressive tone from his prior email to Plaintiff Herman.  He stated, "It is entirely my fault that I placed so much confidence in your independent ability to handle things without me micromanaging your work. I therefore squarely blame myself for not being vigilant to micromanage and push you to show me what you were doing at all times. So, next time perhaps I will be more vigilant with assistants and by demanding to review and monitor their progress on such important tasks." Notably, Defendant Kalyango did not deny missing the expense report meetings, without notice or explanation.

52.    Defendant Kalyango then upped the ante on his hostile and retaliatory behavior toward Plaintiff Herman by falsifying her performance evaluations, which are classified as public records within a federally funded program from the U.S. Department of State.  There are numerous internal discrepancies in the records of these evaluations. In numerous instances, Plaintiff Herman's compilation of evaluations matches perfectly with the original evaluations filled out by students, while Defendant Kalyango's versions of the evaluations have been altered in order to make him and another professor who attended the trip look better and Plaintiff Herman look worse.

53.    In one particularly egregious falsified evaluation, Defendant Kalyango changed an evaluation of Plaintiff Herman that stated "[Plaintiff Herman] is an amazing girl with a big heart. Always willing to help or solve any issue." to "[Plaintiff Herman] is an amazing girl. But we want her to talk to use [sic] like professionals. She doesn't respond to all the needs of some of the fellows." Plaintiff Herman's version of this evaluation matches that of the original evaluation.

54.    Continuing his retaliatory behavior, almost a year after returning from this particular Africa trip, Defendant Kalyango accused Plaintiff Herman of falsifying evaluations and reported her to Defendant Ohio University's internal disciplinary body, the office of University Equity and Civil Rights Compliance (ECRC).

55.    All of Defendant Ohio University's internal investigations into the matter have concluded that Defendant Kalyango is the only person who has falsified evaluations, and that he did so on at least **nine** occasions.

56.    While Defendant Kalyango had told Plaintiff Herman that she would be hired as an assistant for future YALI programs, it appeared to Plaintiff Herman that he had changed his mind upon returning from the Rwanda.

57.    On July 5, 2017, Defendant Kalyango sent an email to Plaintiff Herman terminating her from any future work with the YALI program.

58.     After receiving the email on July 5, 2017, Plaintiff Herman contacted Ohio University's human resources department, who advised her to respond to the email and defend herself.

59.     Later the same day, Defendant replied to Plaintiff's response as follows: "I get it, that it was my fault… all of it.  Many apologies…..I have learned from the experience…. Good night."

60.     On or about July 10, 2017, Plaintiff Herman stepped down from her position as Program Assistant for the SUSI program. Upon hearing the news, Mary Rogus, a professor of Journalism at Ohio University and close friend and associate of Yusuf Kalyango,  contacted Plaintiff Herman and attempted to persuade Plaintiff Herman not to report Yusuf Kalyango to the ECRC.

***Ohio University's deliberate indifference to prior evidence of gender-based preferential treatment of female graduate students by Defendant Kalyango***

61.     It is common knowledge among faculty and students within Ohio University's Journalism Department, particularly faculty and students in the Institute for International Journalism (IIJ), of which Defendant Kalyango is the sole Director, that Defendant Kalyango shows preferential treatment to certain individuals within the Institute—namely women to whom he is attracted. It is well-known within the Department and Institute that Defendant Kalyango shows preferential treatment toward certain female graduate students—but it is also well-known that if these women do not "play his games," and rebuff his advances, these women are at risk of receiving disadvantageous, and possibly retaliatory, treatment from Defendant Kalyango.

62.     Defendant Kalyango heads two programs that exist under the Institute for International Journalism (IJJ), these are the Young African Leaders (YALI) Connect Camp and the Study of the United States Institute (SUSI). Both of these programs are run out of the Institute for International Journalism with little oversight from anyone besides Defendant Kalyango.

63.     Bailey Dick, a participant in the programs run by Defendant Kalyango who served as a witness in Defendant Ohio University's internal investigation into Plaintiff's initial report concerning Defendant Kalyango, stated in the investigation as follows: **"there was preferential treatment of some female participants during the recent SUSI program . . .  Respondent would only eat with certain people, namely the female scholars from Egypt and China. Respondent also took only those two scholars on some sort of boat tour while the SUSI scholars were in Chicago . . . other scholars would say that Respondent hid from them because he wanted to go out to dinner with these two women . . . With one of these, it became clear she wasn't willing to play his games, so he won't work with her."**

64.     Dr. Jeremy Morris, an Ohio University philosophy professor who served as a witness in Defendant Ohio University's internal investigation into Plaintiff's initial report concerning Defendant

Kalyango, stated in the investigation that he had a conversation with Plaintiff on or around May 28, 2017, in which Plaintiff told him that Defendant Kalyango wanted to share a hotel room with her on the trip to Africa. Professor Morris immediately expressed alarm when he learned this and told Plaintiff that this was not okay.

65.     Professor Morris admitted in Ohio University's internal investigation that he was at all relevant times a mandatory reporter and that his failure to report the conversation with Plaintiff to ECRC was a violation of his duties.

66.     At the time that Plaintiff reported Defendant Kalyango's misconduct to Professor Morris, Professor Morris was a mandatory reporter of sexual harassment pursuant to Ohio University's internal policy.

67.     At the time that Plaintiff reported Defendant Kalyango's misconduct to Professor Morris, Professor Morris was an official with the authority to take corrective action pursuant to 20 USC §1682.

68.     Defendant Ohio University has enabled the type of sexual harassment and misconduct that Defendant Kalyango engaged in by continuously failing to implement sufficient mechanisms to prevent professors from using their authority to seek sexual and romantic relationships with students, and by continuously failing to inform and train professors who witness this type of behavior how to correctly respond to it. This is evidenced by the fact that Witness Professor Morris, despite being a professor at Ohio University who recognized that the Defendant Kalyango's attempt to force Plaintiff Herman to share a hotel room with him was sexually inappropriate and would put Plaintiff Herman at risk, did not know where to send Plaintiff to report the issue, or where to report it himself. ("Complainant told Witness H that she was feeling some amount of pressure from the professor who was leading the trip, and in particular the fact that the professor wanted to share a hotel room with Complainant. Witness H told Complainant to let someone know about this, and he suggested that Complainant contact Jenny Klein, the Assistant Dean in University College. Witness H has since realized to whom to report").

69.     Prior to Plaintiff reporting Defendant Kalyango's misconduct to Professor Jeremy Morris, Defendant Ohio University had not trained Professor Morris on reporting sexual misconduct. Defendant University had not provided training, despite having had a lawsuit filed against it on March 8, 2017 based on its faculty's failure to report sexual misconduct and even though the lawsuit requested that Defendant Ohio University provide mandatory training for all mandatory reporters using trauma informed principles.  See *Adams v. Ohio University*, Case: 2:17-cv-00200-ALM-KAJ Doc #: 1 Filed: 03/08/17 Page: 45 of 46 PAGEID #: 45.

70.     Considering that significant deliberate indifference to sexual misconduct that occurred after *Adams v. Ohio University* was filed and after the University had actual notice that it had to train its

faculty on ECRC reporting, a punitive damages award is warranted and necessary here in order to prevent further indifference.

71.     Defendant Ohio University has enabled the type of sexual harassment and misconduct that Defendant Kalyango engaged in not only by failing to provide training to mandatory reporters but also by failing to supervise Defendant Kalyango in any meaningful way. The autonomy, independence, and lack of supervision Defendant Ohio University has given Defendant Kalyango is likely a result of Defendant Kalyango's myriad of professional accomplishments and also a result of the fact that Defendant Kalyango has been pursued for employment by other major American universities.

72.     Defendant Kalyango has not only used the special treatment he receives (for instance, Defendant Kalyango only teaches six weeks per school year) for work related to the Institute for International Journalism, he has also used it to seek out and pressure female students into accepting his advances, sexual and otherwise.

73.     Defendant Kalyango often bragged about how he had access to an Ohio University "research account" in which he was able to spend unmonitored funds.

74.     Defendant Kalyango's general strategy when he makes advances toward female graduate students essentially involves him utilizing his position, authority, and lack of supervision from Defendant Ohio University to dole out gifts to female graduate students he chooses for this special treatment.

75.     Bailey Dick spoke to Defendant Ohio University's internal investigators regarding how she was treated, as compared to an individual like Plaintiff Herman, who was targeted by Defendant Kalyango: "Witness N has never worked for someone she has ever felt so personally uncomfortable with. Respondent is demanding, and things are black and white with him. You are either in or out. Witness N was out from the beginning, because she just needed a summer job. Respondent wouldn't ask her to dinner at his house or ask her to go with the scholars; he wouldn't speak to her on the trips unless it was necessary. Respondent treated Witness N in a condescending and demeaning way, like she was 'the help.' Witness N stated that she, 'Carried a lot of luggage.' Witness N stated that, 'If you're in you in, but if you don't give Respondent anything you are nothing but the help.' Witness N stated that Respondent also bought Complainant a 'super-expensive hike' to see monkeys. Witness N stated that Respondent also took Complainant clothes shopping, while he bought stuff for himself."

76.     The autonomy, independence, and lack of supervision Defendant Ohio University has given Defendant Kalyango allowed him to circumvent normal Ohio University hiring procedures. Defendant Ohio University's internal investigators concluded that the "preponderance of the evidence establishes [Plaintiff Herman] did not go through the normal hiring process before [Defendant Kalyango] offered [Plaintiff Herman] the position of program assistant for YALI. . . . [Plaintiff Herman] reported

that [Defendant Kalyango] offered [Plaintiff Herman] the position of program assistant without a formal interview." The fact that Defendant Kalyango had, and continues to have, the power to hire graduate students based solely on his personal discretion gave him the ability to offer "special treatment" to the female graduate students he targeted, including Plaintiff Herman.

77.     As Bailey Dick stated in the University's internal investigation, it was common knowledge within the journalism department that Defendant Kalyango used his power, authority, and lack of supervision and oversight from Defendant Ohio University to run the Institute for International Journalism, and the associated YALI and SUSI programs, to seek out inappropriate personal, romantic, and possibly sexual relationships with female graduate students.

78.     Defendant Ohio University was deliberately indifferent to evidence of this dynamic prior to Plaintiff Herman and Defendant Kalyango leaving for the Africa trip, where Plaintiff Herman was further subjected to inappropriate romantic and sexual advances.

79.     Attached as Exhibit A is a true and accurate copy of Ohio University's Memorandum of Findings in connection with a 2018 investigation of the allegations against Defendant Kalyango.

80.     Exhibit A is an admission by Ohio University pursuant to Federal Rule of Evidence 801(d).

81.     It is well known within the Journalism Department that current graduate students warn incoming graduate students about Defendant Kalyango's proclivity to make sexual advances towards students.

82.     Prior to Plaintiff Herman and Defendant Kalyango leaving for the trip to Africa and despite Ohio University having been sued in March, 2017 for deliberate indifference by two graduate students in the English Department, Ohio University had still not provided **clear** guidelines or any prescriptive advice to professors and other employees on how to deal with reports or allegations of sexual misconduct from professors towards students.

83.     If Defendant University had properly informed professors and other employees how to respond to instances of sexual misconduct prior to Plaintiff and Defendant Kalyango's trip, it is likely that Defendant Kalyango's advances and inappropriate behavior toward Plaintiff Herman (particularly Defendant Kalyango's attempt to share a hotel room with Plaintiff Herman) would not have occurred and he would not have been in position to cause further mental, emotional, and/or physical harm to Plaintiff Herman and would not have been in a position to retaliate against Plaintiff.

84.     The recent internal investigation into Defendant Kalyango's misconduct substantiated all of Plaintiff Herman's allegations against Defendant Kalyango. The investigation substantiated the allegation that Defendant Kalyango engaged in sexual harassment by quid pro against Plaintiff Herman; it

substantiated the allegation that Defendant Kalyango engaged in sexual harassment by hostile work environment against Plaintiff Herman; and it substantiated that Defendant Kalyango violated University Policy 40.001, which precludes professors from engaging in sexual harassment and sexual discrimination in the fulfillment of their employment responsibilities.

85.     Ohio University knew, or should have known, that Professor Kalyango was unfit to teach at Ohio University because he consistently used his position to make inappropriate personal and romantic advances toward female graduate students.

86.     Witnesses in Defendant Ohio University's internal investigation stated that Defendant Kalyango was known to make inappropriate advances toward female graduate students, and that if a student refused to "play his game," they would suffer consequences.

87.     In or around February 22, 2018, Professor Michael Sweeney, in support of Plaintiff and a witness/victim of Defendant Kalyango's misconduct and in protest of Ohio University's handling of the claims, quit his position within the Journalism department

88.     There are pending at least two other ECRC investigations into Defendant Kalyango's misconduct, in addition to the one involving Plaintiff.

89.     Defendant University's deliberate indifference towards Defendant Kalyango's misconduct is clearly unreasonable and resulted in Plaintiff suffering extensive damages.

90.     It is clearly unreasonable that, as of December 2018, Defendant Kalyango is still employed by Ohio University.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### AGAINST OHIO UNIVERSITY
### Deliberate Indifference resulting in Sexual Harassment
### (Quid Pro Quo) in Violation of Title IX

91.     Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

92.     At all relevant times, Defendant Ohio University received federal funding and assistance.

93.     Plaintiff Herman was subjected to sexual harassment and unwanted sexual advances that were so severe, pervasive, and/or objectively offensive that it deprived her of access to educational and employment opportunities and benefits.

94.     The U.S. Department of Education Office for Civil Rights has established criteria to determine if a school or university that receives public funds is liable for allowing quid pro quo sexual harassment. Their guidelines state:

a.     "Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence."

b. "If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct."

c. "If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.

d. Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision of aid, benefits, or services to students. However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program. Thus, the school has a duty, upon notice of the harassment, to take prompt and effective action to stop the harassment and prevent its recurrence.

e. If the school takes these steps, it has avoided violating Title IX. If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program. The school, therefore, has engaged in its own discrimination. It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.

95.     Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University had actual knowledge of sexual harassment and misconduct committed by Professor Kalyango—namely that he attempted to share a hotel room with a graduate student.

96.     Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University had actual knowledge of the quid pro quo risks inherent in sexual relationships between faculty and students.

97.     Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University knew or should have known that Defendant Kalyango used his position, power, and authority to seek out inappropriate personal and/or romantic relationships with female students.

98.     The sexual harassment committed by Defendant Kalyango against Plaintiff Herman was committed while he was acting as an employee of Defendant University and after Defendant University had, or should have had, knowledge of sexual harassment committed by Defendant Kalyango.

99.     Professor Kalyango's harassment of Plaintiff Herman included physical or verbal conduct of an inappropriate, romantic, and/or sexual nature that was unwelcome and sufficiently severe or pervasive from both a subjective and an objective viewpoint, it would appear that:

   a.   Submission to the conduct was either explicitly or implicitly a term or condition of her employment or academic status;

   b.   Submission to or rejection of such conduct could be used as the basis for employment or academic decisions affecting her; or

   c.   Such conduct had the purpose or effect of unreasonably interfering with the with her work, performance, or education experience; or of creating an intimidating, hostile, or offensive environment for work or learning.

100.    Defendant University's response to Professor Kalyango's inappropriate behavior was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

101.    Professor Kalyango engaged in quid pro quo sexual harassment of Plaintiff Herman.

102.    Defendant University has itself determined that the harassment that Kalyango engaged in against Plaintiff Herman was quid pro quo in nature.

103.    Defendant University's deliberate indifference to Defendant Kalyango's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

104.    As a result of the foregoing, Plaintiff Herman suffered extensive damages.

**SECOND CLAIM FOR RELIEF**

### AGAINST OHIO UNIVERSITY
### Deliberate Indifference resulting in Sexual Harassment
### in Violation of Title IX

105.    Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

106.    At all relevant times, Defendant Ohio University received federal funding and assistance.

107.    Plaintiff Herman was subjected to sexual harassment and unwanted sexual contact that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational and employment opportunities and benefits.

108.    Before Defendant Kalyango's misconduct against Plaintiff Herman, Defendant University had actual knowledge of sexual harassment and misconduct committed by Professor Kalyango.

109.    Before Defendant University's misconduct against Plaintiff Herman, had actual knowledge of the quid pro quo risks inherent in sexual relationships between faculty and students.

110.    There is an inherent power differential in any professor/student relationship at Ohio University.

111.    Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University had actual knowledge of sexual harassment and misconduct committed by Professor Kalyango—namely that he attempted to share a hotel room with a graduate student.

112.    Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University had actual knowledge of the quid pro quo risks inherent in sexual relationships between faculty and students.

113.    Before Plaintiff Herman and Defendant Kalyango left for the trip to Africa, Defendant University knew or should have known that Defendant Kalyango used his position, power, and authority to seek out inappropriate personal and/or romantic relationships with female students.

114.    The sexual harassment committed by Defendant Kalyango against Plaintiff Herman was committed while he was acting as an employee of Defendant University and after Defendant University had, or should have had, knowledge of sexual harassment committed by Defendant Kalyango.

115.    Defendant University's response to Professor Kalyango's inappropriate behavior was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

116.    Professor Kalyango engaged in sexual harassment of Plaintiff Herman after Defendant University had actual knowledge of Defendant Kalyango's sexual misconduct.

117.    Defendant Kalyango's conduct meets both the subjective and objective standards of severity required to establish sexual harassment.

118. Defendant Kalyango's conduct violated Ohio University's own internal policy, Policy 03.004(E)(1).

119. Defendant Kalyango has in the past knowingly exploited his power differential over female students order to make sexual advances towards them. Witnesses in Defendant Ohio University's internal investigation stated that Defendant Kalyango was known to make inappropriate advances toward female graduate students, and that the ones who "played his game" would receive special treatment.

120. Defendant University's deliberate indifference to Defendant Kalyango's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

121. As a result of the foregoing, Plaintiff Herman suffered extensive damages.

**THIRD CLAIM FOR RELIEF**
**AGAINST OHIO UNIVERSITY**
**Deliberate Indifference resulting in**
**Hostile Environment in Violation of Title IX**

122. Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

123. The physical and verbal conduct exhibited by Defendant Kalyango was unwelcome and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff Herman's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

124. The environment created from the conduct of Defendant Kalyango was hostile based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

125. The conduct by Defendant Kalyango violated Ohio University Policy 03.004(E)(2).

126. Defendant Ohio University's response to previous knowledge regarding Professor Kalyango's treatment of female graduate students was deliberately indifferent.

127. Defendant Ohio University's lack of oversight regarding how Defendant Kalyango was conducting the Institute and associated programs was deliberately indifferent.

128. Defendant University's response to known risks prior to Plaintiff Herman and Defendant Kalyango leaving for the Africa trip was clearly unreasonable in light of the known circumstances.

129. Defendant University's response (or lack thereof) to the events before, during, and after the Africa trip also created a hostile environment:

a. After the trip, Plaintiff was subjected to disparate treatment by Defendant Kalyango that was so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

b. For Plaintiff Herman, Ohio University became a sexually hostile environment where her harasser was still on campus and working in the Journalism Department.

c. Professor Kalyango's conduct has interfered with Plaintiff Herman's academic performance.

d. Ohio University was deliberately indifferent to previous reports regarding Professor Kalyango's known behavior.

e. As a result of Ohio University's deliberate indifference, Plaintiff Herman was forced to step down from her position with the Institute and associated programs and has lost educational opportunities and benefits at the university, lost past and future wages, class opportunities, study abroad opportunities, and faced retaliation and unfair treatment from professors in the Journalism department.

f. This conduct constitutes a hostile environment in violation of Title IX.

g. Plaintiff Herman had to endure Defendant Kalyango retaliatorily falsifying evaluations about her performance on the Africa trip and Defendant Kalyango retaliatorily attempting to accuse Plaintiff Herman of falsifying evaluations.

130. Defendant University's deliberate indifference to Defendant Kalyango's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

131. As a result of the foregoing, Plaintiff Herman suffered extensive damages.

### FOURTH CLAIM FOR RELIEF
### AGAINST OHIO UNIVERSITY
### Retaliation in Violation of Title IX

132. Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

133. The retaliation described herein were so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by Defendant University.

134. Defendant University created and/or subjected Plaintiff Herman to a retaliatory environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because:

a. Plaintiff Herman was a member of a protected class;

b. Plaintiff was subjected to sexual harassment in the form of unwanted sexual contact by a Professor;

    c.   Plaintiff Herman was subjected to harassment based on her sex; and

    d.   Plaintiff Herman was subjected to a hostile educational environment created by Defendant University's lack of policies and procedures and failure to properly investigate and/or address the unwanted sexual contact and subsequent harassment.

    e.   Defendant Kalyango retaliated against Plaintiff by altering evaluations and expense reports.

    f.   The retaliation occurred after Defendant University was made aware of Defendant Kalyango's misconduct.

135.    Defendant Kalyango used his position, power, and authority to retaliate against Plaintiff.

136.    Defendant University's failure to promptly and appropriately respond to Defendant Kalyango's behavior denied her educational opportunities and benefits in violation of Title IX

137.    Defendant University engaged in a pattern and practice of behavior designed to avoid taking responsibility for, and responding to Defendant Kalyango's known misconduct.

138.    If Defendant University had properly trained their employees on how respond to potential misconduct of the type Defendant Kalyango engaged in, or properly supervised Defendant Kalyango, it is likely that Plaintiff Herman would never have been put in such a vulnerable position by Defendant Kalyango.

139.    Defendant University, by and through its officials, retaliated against Plaintiff in violation of Title IX.

140.    Defendant University enabled an environment in which Defendant Kalyango could retaliate against young female graduate students.

141.    Defendant University, by and through its agents and employees, encouraged Defendant Kalyango's interactions with young female students.

142.    Defendant University, by and through its agents and employees, acted or failed to act upon knowledge it had of Defendant Kalyango's misconduct in such a way that the response was clearly unreasonable.

143.    One or more of the above acts or omissions was a substantial factor in causing Plaintiff Herman's harm.

144.    Defendant University's conduct as described herein was wanton and willful and in reckless disregard for Plaintiff's well-being.

145.    Defendant University consciously disregarded and was indifferent to the known and obvious risks that Defendant Kalyango imposed.

146.    As a result of the foregoing, Plaintiff Herman suffered extensive damages.

147. This retaliation constituted disparate treatment of females and had a disparate impact on female students.

148. Defendant University's deliberate indifference to Defendant Kalyango's retaliation as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

149. Plaintiff Herman has suffered emotional distress and psychological damage and other damages, and her character and standing in her community and education have suffered from the retaliation, all resulting in a violation of her rights under Title IX.

**FIFTH CLAIM FOR RELIEF**
**AGAINST YUSUF KALYANGO IN HIS INDIVIDUAL CAPACITY**
**Sexual Harassment in Violation of Fourteenth Amendment of the Constitution of the United States of America**
**(Pursuant to 42 U.S.C. § 1983)**

150. Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

151. Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

152. Defendant Kalyango sexually harassed Plaintiff Herman while he was a state actor acting in his individual capacity under the color of state law.

153. Defendant Kalyango subjected Plaintiff Herman to violations of her right to personal security and bodily integrity and Equal Protection of Laws by subjecting her to sexual harassment throughout 2017.

154. Defendant Kalyango subjected Plaintiff Herman to sexual harassment and unwanted romantic and/or sexual advances that were so severe and objectively offensive that it violated Plaintiff Herman's constitutional rights.

155. Defendant Kalyango was in a direct supervisory and evaluative role over Plaintiff Herman.

156. Defendant Kalyango's conduct constituted disparate treatment of females and had a disparate impact on female students and faculty members.

157. Plaintiff Herman has had her academic life and standing disrupted, and has personally suffered emotional and psychological distress, all as a direct and proximate result of Defendant Kalyango's inappropriate behavior.

158. Defendant Kalyango's conduct as described herein violated Plaintiff Herman's clearly established constitutional rights of which a reasonable person would have known.

159. Defendant Kalyango's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

160.     As a result of the foregoing, Plaintiff Herman suffered extensive damages.

**SIXTH CLAIM FOR RELIEF**
**AGAINST YUSUF KALYANGO IN HIS INDIVIDUAL CAPACITY**
**Sexual Harassment (Quid Pro Quo) in Violation of the Fourteenth Amendment to the Constitution**
**of the United States of America**
**(Pursuant to 42 U.S.C. § 1983)**

161.     Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

162.     Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

163.     Defendant Kalyango sexually harassed Plaintiff Herman while he was a state actor acting in his individual capacity under the color of state law.

164.     Defendant Kalyango subjected Plaintiff Herman to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff Herman's constitutional rights.

165.     Professor Kalyango engaged in quid pro quo sexual harassment of Plaintiff Herman.

166.     Professor Kalyango's harassment of Plaintiff Herman included physical or verbal conduct of a sexual nature that was unwelcome and sufficiently severe or pervasive such that, from both a subjective and an objective viewpoint, it would appear that:

   a.   Submission to the conduct was either explicitly or implicitly a term or condition of her employment or academic status;

   b.   Submission to or rejection of such conduct could be used as the basis for employment or academic decisions affecting her; or

   c.   Such conduct had the purpose or effect of unreasonably interfering with the with her work, performance, or education experience; or of creating an intimidating, hostile, or offensive environment for work or learning.

167.     It was reasonable for Plaintiff Herman to believe that her academic status and other benefits were conditioned on submitting to Defendant Kalyango's advances.

168.     A reasonable person under these same circumstances could similarly believe that their academic status and other benefits were conditioned on submitting to Respondent's advances.

169.     Defendant Kalyango's conduct meets both the subjective and objective standards of severity required to establish quid pro quo sexual harassment.

170.     Defendant Kalyango's conduct as described herein violated Plaintiff Herman's clearly established constitutional rights of which a reasonable person would have known.

171.     Defendant Kalyango's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

172. As a result of the foregoing, Plaintiff Herman suffered extensive damages.

**SEVENTH CLAIM FOR RELIEF**
**AGAINST YUSUF KALYANGO IN HIS INDIVIDUAL CAPACITY**
**Hostile Environment and Retaliation in Violation of the Fourteenth Amendment to the Constitution of the United States of America**
**(Pursuant to 42 U.S.C. § 1983)**

173. Plaintiff Herman re-alleges all prior paragraphs of the Complaint as if set out here in full.

174. Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

175. Defendant Kalyango sexually harassed Plaintiff Herman while he was a state actor acting in his individual capacity under the color of state law.

176. Defendant Kalyango subjected Plaintiff Herman to a hostile work environment and retaliation that was so severe and objectively offensive that it violated Plaintiff Herman's constitutional rights.

177. The conduct by Defendant Kalyango was of a sexual nature and was unwelcome and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff Herman's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

178. The environment created from the conduct of Defendant Kalyango was hostile based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

179. Defendant Kalyango's actions before, during, and after the Africa trip also created a hostile environment:

    a. After the trip, Plaintiff was subjected to disparate treatment by Defendant Kalyango that was so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

    b. Defendant Kalyango created and/or was deliberately indifferent to a hostile environment where Plaintiff Herman was retaliated against and lost significant educational and employment opportunities.

    c. The investigation has weighed on Plaintiff Herman heavily. Professor Kalyango's conduct has interfered with Plaintiff Herman's academic performance.

    d. Defendant Kalyango was deliberately indifferent to Plaintiff and to the hostile environment that he created .

e. As a result of Defendant Kalyango's conduct and/or deliberate indifference, Plaintiff Herman was forced to step down from her position with the Institute and associated programs and has lost educational opportunities and benefits at the university.

f. This conduct and/or deliberate indifference was in violation of the Fourteenth Amendment.

g. Defendant Kalyango's retaliatorily falsifying evaluations about Plaintiff Herman's performance on the Africa trip and Defendant Kalyango retaliatorily attempts to accuse Plaintiff Herman of falsifying evaluations contributed to the hostile environment.

180. Defendant Kalyango's conduct towards Plaintiff as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

181. As a result of the foregoing, Plaintiff Herman suffered extensive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants and asks the Court to enter judgment against the Defendants and in favor of Plaintiff for the following relief:

(a) Judgement against Defendants for a sum commensurate with the damages Plaintiff sustained, plus the costs of this suit and any other relief that the court considers proper;

(b) Damages for past and future medical expenses and treatment;

(c) Damages for past and future emotional and psychological distress, physical illness and harm, loss of normal life, disability, and lost educational opportunities;

(d) Damages for past and future lost wages;

(e) Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual harassment; damages for deprivation of equal access to the educational benefits and opportunities provided by Ohio University; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, past, present, and future medical expenses, and lost earnings and earning capacity;

(f) Other Compensatory Damages;

(g) Injunctive relief as this Court deems necessary and proper;

(h) A declaratory judgment that Defendants violated Plaintiff's Constitutional rights;

(i) That this Court Order Defendant University to provide mandatory training for all mandatory reporters using trauma informed principles;

(j) That this Court Order Defendant University to dismiss Defendant Kalyango from his employment with Ohio University and not permit him on or near Campus;

(k) That Defendant University be ordered to provide a public statement that it has failed to maintain a safe environment for victims of sexual misconduct;

(l) That Defendant University be ordered to create a system of reporting sexual misconduct that is less intimidating for the most vulnerable members of the community: students, untenured faculty, and junior faculty.

(m) That Defendant University be ordered to provide a statement from the President of the University and the deans of the University inviting students, faculty, and staff to report incidents of sexual misconduct to their college's dean if they fear retaliation within their departments.

(n) That Defendant University be ordered to provide a public statement that it will not tolerate any retaliation against victims and reporters of sexual misconduct;

(o) Other injunctive relief to be determined at trial requiring Ohio University to comply with federal law under Title IX;

(p) Pre- and post-judgment interest;

(q) Costs;

(r) Punitive Damages;

(s) Attorney's fees pursuant to all relevant statutes and law including, but not limited to, 42 U.S.C. § 1988(b); and

(t) Such other and further relief as the Court may deem just and proper.

DATED: January 20, 2019                                   Respectfully submitted,


                                              s/ *Michael L. Fradin*
                                              Attorney for Plaintiffs

                                   LAW OFFICE OF MICHAEL L. FRADIN
                                              Michael L. Fradin, Esq.
                                              8 N, Court St. Suite 403
                                              Athens, Ohio 45701
                                              Telephone: 847-986-5889
                                              Facsimile: 847-673-1228
                                              Email: mike@fradinlaw.com